J-A03038-19

2019 PA Super 189

| | | |
|---|---|---|
| RAYMOND A. MITCH, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| XTO ENERGY, INC., | : | |
| | : | |
| Appellee | : | No. 1096 WDA 2018 |

Appeal from the Order Entered July 5, 2018
in the Court of Common Pleas of Butler County
Civil Division at No(s): A.D. No. 16-10505

BEFORE: BOWES, J., SHOGAN, J. and STRASSBURGER, J.*

OPINION BY STRASSBURGER, J.: **FILED JUNE 12, 2019**

Raymond A. Mitch appeals from the order entered on July 5, 2018, which denied his amended motion for summary judgment, granted summary judgment in favor of XTO Energy, Inc. (XTO), and dismissed Mitch's declaratory judgment action. After review, we affirm.

The trial court summarized the facts of the case as follows.

> This case arises from a Paid Up Oil and Gas Lease [(Lease)] and corresponding addendum [(Addendum)], entered into between the parties, both under date of January 6, 2012.
>
> Mitch is the owner of real property located in Oakland Township, Butler County, Pennsylvania, designated as Butler County Tax Map Parcel Number 250-1F105-7J-0000, comprised of 53.28 acres. Mitch maintains his primary residence on said real property.

---

* Retired Senior Judge assigned to the Superior Court.

Mitch and his late wife entered into the [] Lease and Addendum [], leasing the oil and gas rights associated with the hereinabove[-]described property to XTO for the purpose of permitting XTO to drill and extract oil and gas beneath the surfaces of Mitch's said property.  Under the Lease, Mitch would, and did, receive an up-front bonus payment, as well as royalty payments in the amount of [18%] thereafter.  Additionally, paragraph [] 4 of the Addendum states as follows:

> If any well(s) is (are) drilled on the lease premises and is (are) producing in paying quantities, the surface owner shall be entitled to receive a payment in lieu of free gas equal to 300,000 cubic feet of gas multiplied by the average price received by Lessee during the preceding year of production, provided the surface owner has his primary residence on the lease premises.

[Addendum, 1/6/2012, at ¶ 4.]

Said Lease and Addendum were drafted by XTO and provided to Mitch.

Subsequent to the Lease [], a well pad was constructed on property owned by Timothy A. Welter.  Pursuant to paragraph [] 15 of the Lease [], XTO was permitted "to pool and unitize all or any part of the lease premises with any other lease or leases, land or lands, mineral estates, or any of them whether owned by the Lessee or others, so as to create one or more pooled units." [Lease, 1/6/2012, at ¶ 15.]  As a result, pursuant to a Designation of Unit, T Welter Unit, under date of December 2, 2013, the lease on Mitch's land was pooled and combined with certain other leases "for the purpose of drilling for development, and production of gas and liquid hydrocarbons[." Designation of T Welter Unit (T. Welter Unit), 12/2/2013, at ¶ 1.]

Consequently, it is via the T. Welter well pad that XTO horizontally drilled beneath the surface of Mitch's property to gain access to any oil and gas thereunder, pursuant to the Lease

- 2 -

and Addendum [], and the [T. Welter Unit].[1]  It is uncontested that said well is producing in paying quantities.

There is no dispute that the vertical portion of the well, *i.e.*, the well pad, access roads, pipeline, tanks, equipment, and/or any associated facilities are not located on Mitch's property.  Said vertical components of the well are located on the property owned by Timothy A. Welter.

Trial Court Opinion, 8/30/2018, at 1-3 (party designation, capitalization and emphasis altered).

On July 8, 2016, Mitch filed a complaint against XTO, seeking a declaratory judgment that he was due and owed payment pursuant to paragraph 4 of the Addendum.

At the close of pleadings, Mitch moved for summary judgment on March 30, 2017.  Following continuances and discovery, Mitch filed an amended motion for summary judgment on January 30, 2018, and XTO moved for summary judgment the next day.  Following argument, the trial court denied Mitch's amended motion, granted summary judgment in favor of XTO, and dismissed Mitch's declaratory judgment action with prejudice on July 13, 2018.

This timely-filed appeal followed.[2]  Mitch raises two issues on appeal.

---

[1] The Well Location Plat for the T. Welter Unit designates the well as Well 1H (T. Welter Unit Well).  The parties agree that the horizontal component of the T. Welter Unit Well traverses Mitch's property beneath the surface, but the well pad and vertical portion of the T. Welter Unit Well are not located on Mitch's property.  **See** Complaint, 7/8/2016, at ¶ 12-13; XTO's Brief at 4.

[2] Mitch and the trial court complied with Pa.R.A.P. 1925.

I. Did the trial court err by failing to interpret the contract, specifically [paragraph] four of the Addendum, in accordance with law and the manifest intent of the parties as evidenced by the words utilized?

II. Did the trial court commit error when its findings can only be supported upon a determination of contract ambiguity and evaluation of evidence related to the parties' intent to which genuine issues of material fact remain?

Mitch's Brief at 7.

We consider Mitch's issues mindful of the following.

Our standard of review on an appeal from the grant of a motion for summary judgment is well-settled. A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

***Krauss v. Trane U.S. Inc.***, 104 A.3d 556, 562-63 (Pa. Super. 2014)

(citations omitted).

We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [its] cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury.

*H & R Block E. Tax Servs., Inc. v. Zarilla*, 69 A.3d 246, 248–49 (Pa. Super. 2013) (citations omitted); *see also* Pa.R.Civ.P. 1035.2.

It is settled that because contract interpretation is a question of law, our review of the trial court's decision is *de novo* and our scope of review plenary. *Bair v. Manor Care of Elizabethtown, PA, LLC*, 108 A.3d 94, 96 (Pa. Super. 2015).

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*Maisano v. Avery*, ___ A.3d ___, 2019 WL 638976 at *4 (Pa. Super. Feb. 15, 2019) (citation omitted). Further, as our Supreme Court has held,

> [a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The "reasonably" qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable. Furthermore, reviewing courts will not distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity. Finally, while ambiguous writings are interpreted by the finder of fact, unambiguous ones are construed by the court as a matter of law.

*Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009) (citations and some quotation marks omitted). In addition, we note the following.

> [O]il and gas leases are subject to the same contract law principles that apply to contract interpretation generally. When a writing is clear and unequivocal, its meaning must be determined by its contents alone. We must be mindful that the object in interpreting instruments relating to oil and gas interests, like any written instrument, is to ascertain and effectuate the intention of the parties.
>
> In construing a contract, we must give effect to all of the provisions therein. An interpretation will not be given to one part of the contract which will annul another part of it.

***Porter v. Chevron Appalachia, LLC***, ___ A.3d ___, 2019 WL 493216 at \*4-5 (Pa. Super. Feb. 8, 2019) (citations omitted).

Paragraph 4 of the Addendum entitles Mitch to payment in lieu of free gas if (1) a well is drilled on the lease premises; (2) the well is producing in paying quantities; and (3) Mitch maintains his primary residence on the lease premises. Addendum, 1/6/2012 at ¶ 4. The parties do not dispute that the T. Welter Unit Well is producing in paying quantities and that Mitch maintains his primary residence on the lease premises. **See** Trial Court Opinion, 8/30/2018, at 2; Mitch's Brief at 25-26. Thus, the primary issue we are called to determine is whether there is a well drilled on the lease premises, as provided by paragraph 4 of the Addendum.

The terms "well" and "on the lease premises" are not defined in the Lease. The term "lease premises" is, however, defined in the Lease as follows.

> All that certain tract of land situate in the Township of Oakland, County of Butler, Commonwealth of Pennsylvania, and bounded substantially as follows (the "lease premises"):

Tax ID 250-1F104-7J and bounded as follows:

On the North by lands now or formerly of: 250-1F04-5D;

On the East by lands now or formerly of: 250-1F04-8;

On the South by lands now or formerly of: 250-1F04-10A;

On the West by lands now or formerly of: 250-1F04-7F; Fallecker Rd.

and containing 53.28 acres, whether actually containing more or less; being all or a portion of that certain land described in that certain deed to Lessor from John J. Stayduhar, dated November 27, 1991 recorded in Book 1906 Page 298 in the Official Records of said County.

Insofar and only insofar as the lease premises cover depths of one thousand feet (1000') below the stratigraphic equivalent of the base of the Speechly Sandstone Formation being defined at a depth of approximately 2,578, as seen on the Schlumberger Compensated Neutron/Litho-Density/Gamma Ray log ran January 12, 2007 in the PC Exploration, Inc. Steven Lesney *et ux* Well Number 1 (API Serial No. 37-019-21438-00) located in Connoquenessing Township, Butler County, Commonwealth of Pennsylvania.

Lease, 1/6/2012, at 1.

According to Mitch, paragraph 4 of the Addendum entitles him to payment in lieu of free gas because a well has been drilled on the lease premises (*i.e.*, horizontal portion of the T. Welter Unit Well that is drilled beneath the surface of Mitch's property). Mitch's Brief at 16-26. Mitch argues that the horizontal portion of the T. Welter Unit Well drilled beneath the surface of his property is a well drilled on the lease premises, as

contemplated in paragraph 4 of the Addendum. Mitch's Brief at 16-26. Mitch contends that the term "well" in paragraph 4 of the Addendum means either a vertical or horizontal well. *Id.* at 19. Mitch points to various paragraphs in the Lease where a vertical or horizontal well is referenced specifically. *Id.* at 19-20. As such, Mitch argues, the failure to indicate the type of well in paragraph 4 of the Addendum means that it includes both. In addition, Mitch argues that the Lease, when read as a whole, supports his contention that "on the lease premises" indicates proximity and encompasses both on and beneath the surface. *Id.* at 21-25.

XTO, on the other hand, maintains that to receive payment under paragraph 4 of the Addendum, a well must be drilled on the surface of the lease premises, not beneath. *Id.* at 6-8, 10-23. XTO argues that Mitch is not entitled to payment under paragraph 4 of the Addendum because the T. Welter Unit Well is not drilled on the surface of Mitch's property, but rather, beneath it. *Id.* XTO argues the ordinary meaning of the word "on" means on the surface of the leased premises, and points to 46 provisions in the Lease and Addendum where the term "on the lease premises" is used to refer to surface activities. *Id.* at 13-18.

In interpreting paragraph 4 of the Addendum against Mitch, the trial court reasoned as follows.

> When read as a whole, the only reasonable interpretation of paragraph [] 4 of the Addendum is that Mitch would receive payment in excess of the royalties and bonus, and in lieu of free gas[,] where his primary residence was on the drilling land, and

a vertical drilling mechanism, or well pad, was constructed **on the surface** of his[] property. It makes no reasonable or rational sense that XTO would contract for an additional benefit in favor of Mitch where there is no additional detriment to Mitch, *i.e.*, disruptive operations related to the vertical surface components of a well. To do so[] would be more of a charitable act than is reasonable to find as part of a business transaction for profit.

If XTO was [*sic*] to construct the vertical portion of the well on the surface of Mitch's land, *i.e.*, the well pad including access roads, pipeline, tanks, equipment, and/or any associated facilities, there would be a loss of enjoyment and/or disruption in Mitch's use of his land such that further payment to him by XTO would be appropriate. Conversely, if XTO merely drills horizontally far below the surface of Mitch's land, there is no greater detriment to Mitch than that which was contracted for in exchange for royalty and bonus payments. Pursuant to the Lease and Addendum [], Mitch is already being compensated in the form of bonus and royalty payments for the rights he has leased to XTO. Consequently, further payment without further disruption would not make logical, consistent, or reasonable sense.

Thus, it is clear that the parties' intentions to contract for the possibility of the scenario as described above, *i.e.*, vertical well components being constructed on the surface of Mitch's land, did not come to fruition. Accordingly, Mitch is not entitled to the additional payment in lieu of free gas, as provided for in paragraph [] 4 of the Addendum [].

Trial Court Opinion, 8/30/2018, 6-7 (party designation, capitalization and some emphasis altered). We discern no error in the trial court's analysis.

Specifically, we conclude that the trial court properly determined that the language of paragraph 4 of the Addendum is unambiguous. **See id.** at 6. Our review of the Lease and Addendum as a whole leads us to ascertain the parties' intent in using the phrase "on the lease premises" in paragraph 4 of the Addendum to mean on the surface of the lease premises. To

- 9 -

require XTO to pay in this situation would be an unreasonable interpretation that does not effectuate the intention of the parties. *See Trizechahn Gateway LLC*, *supra*; *see also RESPA of Pa., Inc. v. Skillman*, 768 A.2d 335, 340 (Pa. Super. 2001) ("A contract is not ambiguous merely because the parties do not agree on its construction.") (citation omitted).

Under paragraph 4 of the Addendum, a surface owner is not entitled to payment in lieu of free gas unless, *inter alia*, a well is drilled on the lease premises. It is unreasonable to find that the parties intended to compensate a **surface owner** (who may be different from the lessor) where a well, situated on the surface of another's property, has a horizontally-drilled portion that traverses the surface owner's land thousands of feet beneath the surface. This interpretation is furthered by the fact that payment is to a surface owner, intending to compensate for operations on the surface of the property. *See also* Lease, 1/6/2012, at ¶ 14 (providing, *inter alia*, payment to surface owner for agricultural crop damages due to XTO's well pad locations). Moreover, the second use of the phrase "on the lease premises" in paragraph 4 of the Addendum, which requires a surface owner to have his primary residence "on the lease premises" supports this interpretation. Addendum, 1/6/2012, at ¶ 4. Surely, the parties' intent in using this phrase with respect to the primary residence was to require a primary residence on the surface of property.

Mitch's arguments that paragraph 4 of the Addendum includes horizontal wells and the use of the term "on" means proximity to the surface do not create ambiguity. We should not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Trizechahn Gateway LLC*, 976 A.2d at 483; *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) ("When the terms of a written contract are left undefined, they are to be given their ordinary meaning."). Here, in construing the word "on" in its ordinary sense and reading the Lease and Addendum together as a whole, we conclude that the only reasonable interpretation of "on the lease premises" is to mean on the surface of the lease premises. Accordingly, because a well is not drilled on the surface of the lease premises, Mitch is not entitled to compensation pursuant to paragraph 4 of the Addendum.

In light of the foregoing, we affirm the order of the trial court.[3]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/12/2019

---

[3] Due to our disposition, we need not address Mitch's remaining issue.